## HENRY MONELL vs. THE NORTHERN CENTRAL RAILROAD COMPANY.

Where a contract is made, by a shipper of goods, with one of several connecting railroad companies forming a continuous line of carriers between the place of shipment and the place of delivery, for the transportation of goods and delivery thereof at the place of destination, the service performed by the other companies in the line is deemed to be done by, and at the request of the contracting company, and as its agents.

The acts and management of such connecting roads are, in law, the doings of the contracting company; and if they are such as to work a breach of the

contract for transportation, the shipper has a right of action therefor, against the contracting company.

When the contract of a carrier is silent in respect to the time of delivery, the law requires him to use due diligence. The want of due diligence is the ground of the carrier's liability.

What is sufficient evidence to be submitted to the jury, upon the question of due diligence in delivering perishable property.

The defendant, a common carrier of goods for hire, contracted to transport a quantity of potatoes from Batavia, N. Y., to the city of Philadelphia. The potatoes were in good order, when shipped. The cars containing them arrived at G., a place within three miles of the place of delivery, within the usual time, but were left on the tracks at G. for at least fourteen days, before being taken to the city; and during that period the potatoes were frozen. It appeared that the company employed by the defendant to aid in the transportation and delivery of this freight had no warerooms in Philadelphia for storing freight temporarily, with a view to hasten and facilitate delivery; and that there was, at the time, a great accumulation of freight, both at that place and at G. *Held,* that upon the evidence, it was a fair question for the jury to say whether or not due diligence was used by the defendant, in delivering the freight; and that the judge properly refused to take the case from the jury by granting a nonsuit, or ordering a verdict for the defendant.

*Held,* also, that if the potatoes were frozen at G., after a reasonable time for delivery had elapsed, the defendant was chargeable with the loss. That nothing short of a calamity would justify the holding of the cars at G. for so long a time.

Receipts for freight, given by a consignee to the carrier, stating the goods to be in good order, are evidence in favor of the latter that the freight was delivered in good order. But, as between the parties, they are not conclusive on the question.

When it appears that the carrier demanded that the receipts should be put in that form, as a condition to the delivery of the goods; and that the receipts were signed under a protest that the goods were not in good order; it is a fair question of fact for the jury, on the evidence, and cannot be disposed of in favor of the carrier, as a question of law.

ON the trial, a verdict was rendered for the plaintiff, and the defendant moved for a new trial on a case containing exceptions.

*John Hubbell,* for the defendant.

*George Bowen,* for the plaintiff.

BARKER, J. It is admitted by the pleadings that the defendant is a common carrier of goods for hire, between the village of Batavia, N. Y., and the city of Philadelphia, Pa.; and that it received the goods in question for transportation from Batavia to Philadelphia. It is also admitted that the defendant is a foreign corporation, created by and under the laws of Pennsylvania.

The case does not disclose what part of the connecting line of railroads, between the places mentioned, is owned and managed by the defendant. It is not at all important to know, in the determination of the plaintiff's rights and the defendant's obligations under the contract admitted ; as the contract was entire, to deliver the goods at the place of destination. The service performed by the other and connecting roads was done by and at the request of the defendant, and as its agents. They simply aided the defendant to perform its agreement. The acts and management of such roads were in law the doings of the defendant ; and if they were such as worked a breach of the defendant's contract, it gives the plaintiff a right of action for the damages he has sustained. (*Manhattan Oil Co.* v. *Camden & Amboy R. R. &c. Co.*, 54 *N. Y.*, 197.)

The rights, franchises and privileges conferred on the defendant by the law of its creation are not disclosed, and it will therefore be presumed, as against the corporation itself, that the act gave it full power and authority to make the contract it did with the plaintiff.

The chief question in the case is this : Was it fairly proved, on the trial, that the defendant failed to perform its contract, in not making a timely delivery of the goods, and that in consequence of the delay the property was injured by frost ?

In respect to the time of delivery, when the contract is silent on the subject, the law requires the carrier to use due diligence, in the performance of his agreement

in this respect. The want of due diligence is the ground of the carrier's liability. (2 *Parsons on Contracts*, 185. *Parsons* v. *Hardy* 14 *Wend.*, 217. *Wibert* v. *New York & Erie R. R. Co.*, 12 *N. Y.*, 245. *Condict* v. *Grand Trunk R. R. Co.*, 54 *id.*, 505.)

I am well satisfied that sufficient evidence was given, on the trial, to make a case for the jury to say whether due diligence had been used, or not, in the delivery of the property ; and that the court properly refused to take the case from the jury, by granting a nonsuit, or ordering a verdict for the defendant, as was requested on the trial.

The place in the city of Philadelphia where property of this character, transported by the defendant, was delivered to the consignees, was at the Reed street depot. The cars in which the potatoes were shipped, arrived at Greenwich Point, a place three miles from the Reed street depot, within three or four days after they started from Batavia, and within the usual time for making the trip. These cars were left on the tracks at Greenwich Point, for the period of at least fourteen days. It appears that at Greenwich Point, the Pennsylvania Rail Road Company has yards and tracks, where cars with freight for city delivery come to rest until they can be run up to the depot, for a discharge of freight.

It would seem as if this circumstance, alone, was sufficient proof to put the defendant to its excuse for the delay ; that nothing short of a calamity could justify the holding of these cars at this place for so long a time. The goods had reached their destination, and nothing short of a want of the usual and proper facilities for the delivery could delay the same for so many days.

The excuse presented for this prolonged delay is, that the accumulation of cars at Greenwich station was unusually large, and that they were brought up to the Read street depot as fast as they could be unloaded and the freight delivered to the consignees. The plaintiff's con-

signee, who was on the ground from the time the cars arrived at Greenwich Point, says he at once called for the goods, and that he was ready, with men and teams, to receive them; that he informed the employés of the company that the cars were at Greenwich Point; and that day after day promises were made to bring up the cars containing the potatoes.

The defendant called two witnesses to prove the mode and manner of doing the business of this character, at Philadelphia, and the causes that led to the delay in unloading these cars. These witnesses were connected with railroads, and, with others, had the charge and management of the business at these points. One of them says: "In November and December of last year, there was an accumulation of cars at the Greenwich station, caused by the potatoe merchants not unloading directly (precisely) at the railroad wharf. The cars were accumulating at Greenwich by reason of a great accumulation of cars at the Reed street station. * * * The course of business between our company and the consignees was to have the cars come up from Greenwich as fast as we had facilities for discharging them." "I can't say exactly how many car loads of potatoes we discharged during the month of December that year, or from the first to the twentieth of December, which would cover all this ground; it was a large number; we had, I suppose, a thousand cars, possibly eleven hundred, a good many every day, and these cars had all been detained at Greenwich and sent up to the station, and discharged as fast as we could. The only reason I can assign why the cars spoken of by Mr. Blizard (the cars in question) were not taken to the Reed street wharf earlier was, that the market was so glutted that the consignees and receivers could not get up the cars. I don't think that the cars were held at Greenwich any length of time. The facilities were all occupied with cars

loaded with potatoes; these cars could not be sent up faster than they were."

It also appeared that the railroad did not deliver goods at Greenwich; and at the Reed street wharf it had no warerooms, and delivered goods from the cars standing on the track, and consignees were permitted to sell and deliver the potatoes from the cars by the measure, and in small quantities.

One other witness for the defendant testified, "that the capacities in forwarding these potatoes, cars and their capacities, at Reed street, were sufficient to unload them, if the merchants could have sold them for better prices. The tracks not having sufficient capacity they allowed them to accumulate at Greenwich, and if the merchants would unload them in any reasonable time, within the twenty hours specified, but in two or three days they would bring them up. But they failed to do it, and consequently the company were compelled to leave them at Greenwich for want of capacity at Reed street wharf."

Upon all the evidence presented, it was a fair question for the jury to say, whether or not due diligence was used by the defendant in delivering the freight. After freight is received by the carrier and forwarded, the owner has the right to anticipate its arrival at its destination within the usual and customary time; and to effect this the carrier must exert all reasonable effort to accomplish it. If unforeseen difficulties are encountered, prompt and resolute action, fairly commensurate to the cause of delay, must be resorted to to end the hindrance; otherwise the charge of negligence and want of due diligence is maintained.

Here it appears that the company employed by the defendant, and paid for the transportation and delivery of this freight, had no warerooms in Philadelphia for storing freight temporarily, with a view to hasten and facilitate delivery. That another cause of delay was,

that consignees were tardy in unloading cars; and in some instances were permitted to make sales and delivery from the cars, to their own customers, an unusual practice.

It cannot be successfully maintained, in my opinion, that when goods have been detained for delivery fourteen days after their arrival at the place of destination, and no other excuse presented than such as appears in this evidence, it is purely a question of law, and that the court should hold that due diligence has been used.

The charge of the court to the jury is not set forth in the case, and it must be presumed that the rule of law was correctly stated, and properly illustrated.

The evidence showed that the potatoes were in good order when delivered to the carrier; and it also tended to prove that before they were delivered to the consignees, and while at Greenpoint, they were frozen. If frozen at Greenpoint, after a reasonable time had elapsed within which to deliver them, the defendant was chargeable with the loss. (*Michaels* v. *The New York Cen. R. R. Co.*, 30 *N. Y.*, 564.)

The receipts given by the consignees were evidence in favor of the defendant that the potatoes were delivered in good order. But, as between the parties, they were not conclusive, on the question. The plaintiff claims that the defendant demanded that the receipt should be put in this form as a condition to the delivery of the goods; that when the receipts were signed and delivered, a protest was made that the goods were not in fact in good order. Upon the evidence, it was a fair question for the jury, and could not be disposed of in favor of the defendant, as a question of law.

One of the consignees of the goods, Mr. Blizard, was called and examined as a witness for the plaintiff, and testified as to the time of the delivery, and as to the form of the receipt required by the railroad company; and, among others, this question was propounded to him:

"In reference to these receipts, I will ask you, could you have got this freight, at all, without having signed these receipts?" This question was objected to, by the defendant's counsel, as inadmissible and incompetent. The court overruled the objection, and the question was sustained, and the defendant excepted.

If this question was intended as an inquiry made of the witness if the company demanded the receipt as a condition of the delivery, then it was proper, as it was an inquiry concerning a fact. If it was an inquiry for the opinion of the witness whether the company would have delivered the goods if he had not signed the receipt, it would doubtless be an incompetent question. But the evidence of the witness, which follows this question and the rulings thereon, does not appear to be responsive to the inquiry, and is a mere statement of the facts pertinent to the issues. So no injury has followed the ruling of the court; whatever may be said as to the form of the question.

The motion for a nonsuit is denied, with costs.

[GENESEE SPECIAL TERM, March, 1877. *Barker,* Justice.]